## BRUNER *el al.* v. SANDERS *et al.*

No. 1200.    Opinion Filed July 12, 1910.

(110 Pac. 730.)

**INDIANS—Seminoles—Death of Allottee — Descent of Land.** Section 2 of the act of Congress approved June 2, 1900, entitled, "An act to ratify an agreement between the Commission of the Five Civilized Tribes and the Seminole Tribe of Indians" (Act June 2, 1900, c. 610, 31 Stat. 250), controls the descent of land to which a duly enrolled member of the Seminole tribe of Indians who died after the 31st day of December, 1899, before receiving his allotment, is entitled; but said section has no application, and does not control the descent of land allotted to a member of said tribe of Indians who died after said date, but who received his allotment prior to his death.

(Syllabus by the Court.)

*Error from District Court, Seminole County; Robert M. Rainey, Judge.*

Action by Benjamin F. Bruner and others against Elijah Sanders and others. Judgment for defendant, and plaintiffs bring error. Affirmed.

Plaintiffs in error on the 12th day of January, 1909, brought this action in the district court of Seminole county against defendants in error for possession of a certain tract of real estate situated in said county. They allege in their petition that they are the owners of the legal estate in fee simple and of the equitable estate in the land they seek to recover. They allege that the defendants Elijah Sanders, Daniel, David, and Ellen Bruner are

in possession of the land and unlawfully refuse to surrender the same to plaintiffs, and further allege that defendants Sam Norton and A. T. Biggers are claiming some interest in the land, the nature of which is unknown to plaintiffs. Elijah Sanders filed his separate answer, denying the title of plaintiffs and their right to possession, and alleged that he is in possession of the property under defendants David, Daniel, and Ellen Bruner, all three of whom are minors represented in this proceeding by their guardian *ad litem.* Defendants Norton and Biggers filed their separate answer, denying the title and right of possession of plaintiffs, and allege that they are the owners of the legal and equitable title to the land in controversy, and by way of cross-petition pray for judgment against their codefendants for possession of the land.

The case was tried to the court without a jury upon an agreed statement of facts, which are briefly as follows: Myers Bruner, a duly enrolled Seminole freedman, was during his lifetime allotted the land in controversy. He had intermarried with one Angelina Moses, a Chickasaw freedwoman, who had borne him the three minor children, Daniel, David, and Ellen Bruner. Said minors have been enrolled and allotted land as Chickasaw freedmen. . Angelina Bruner died before receiving allotment, but subsequent to her death allotment was made to the administrator of her estate for her as a Chickasaw freedwoman. Myers Bruner at his death left no other issue or descendants than the three children aforesaid. He left no brother or sister nor descendants of such surviving him. His mother had died intestate prior to his death, and left surviving her two brothers, Tom Bruner and Benjamin F. Bruner, and a sister, Anna Payne, *nee* Anna Bruner, plaintiffs in this proceeding. His grandmother and grandfather on the maternal side had died long prior to his death. John Bruner, the father of Myers Bruner, survived said son and executed a deed of conveyance to the defendants Sam Norton and A. T. Biggers for the land in controversy. The parties deraign respectively their claim of title to the land in controversy as follows: Norton and Biggers claim a right of recovery based upon the title acquired

by them from John Bruner, the father of the deceased. Plaintiffs insist that under the law in force in the Seminole Nation at the time of Myers Bruner's death, which occurred in the year 1902, they constitute as uncles and aunt on the maternal side the only heirs of the deceased. The three minor children contend that they inherited the land as the only heirs and descendants of their father, Myers Bruner. The judgment of the trial court was in favor of the three minor children.

*J. A. Baker,* for plaintiffs in error.

*Davis & Davis* and *A. M. Fowler,* for defendants in error Norton and Biggers.

*Everest, Smith & Campbell,* for other defendants in error.

HAYES, J. (after stating the facts as above). Counsel for plaintiffs in error in their brief correctly state that the sole question in this case is: To whom did the allotment of Myers Bruner descend at the time of his death in the year 1902? Section 2 of the act of Congress approved June 2, 1900, entitled, "An act to ratify an agreement between the Commission to the Five Civilized Tribes and the Seminole Tribe of Indians," reads:

"If any member of the Seminole Tribe of Indians shall die after the thirty-first day of December, eighteen hundred and ninety-nine, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs who are Seminole citizens, according to the laws of descent and distribution of the state of Arkansas, and be allotted and distributed to them accordingly: Provided, that in all cases where such property would descend to the parents under said laws the same shall first go to the mother instead of the father, and then to the brothers and sisters, and their heirs, instead of the father." (Act June 2, 1900, c. 610, 31 Stat. 250.)

Plaintiffs in error contend that the foregoing statute constitutes a general statute regulating the descent and distribution of all the property of all members of the Seminole Tribe of Indians who die after the 31st day of December, 1899; that it regulates the descent and distribution of the property of such deceased Indians, whether the same be tribal land unallotted or land allotted

to the Indian at the time of his. death and in his possession. They further contend that, since the three minor children of Myers Bruner are not enrolled members of the Creek Tribe of Indians and are enrolled as Chickasaw freedmen, they are not Seminole citizens, and are therefore excluded by said section from inheriting from their father land allotted to him; that under said section, in the absence of children or their descendants who are enrolled members of the Seminole Tribe of Indians, the mother of the deceased Indian, and, in the event of her death, her heirs, inherit the property of the mother's deceased son, to the exclusion of all others. Counsel for defendants Norton and Biggers also contend that said statute is a general law regulating descent and distribution; but that the mother of Myers Bruner having died prior to his death, and since Myers Bruner left no brothers or sisters or descendants of such surviving him, the father of Myers Bruner inherited said land under said section. The trial court took the view of this statute that it is not a general statute of descent and distribution, but a special statute applicable only to the property of enrolled members of the Seminole Tribe of Indians who die subsequent to the 31st day of December, 1899, whose property, if lands, had not been allotted to the Indian, or, if other property, had not been distributed to him at the time of his death. In this construction of the statute by the trial court we concur.

On the 28th day of June, 1898, Congress enacted the act generally known as the Curtis act, entitled, "An act for the protection of the people of the Indian Territory, and for other purposes." Act June 28, 1898, c. 517, 30 Stat. 495. By section 11 of this act it is provided that when the roll of citizenship of any of the Five Civilized Tribes is completed, and the survey of the lands of such tribe is finished, the Commission to the Five Civilized Tribes shall proceed to allot the exclusive use and occupancy of the surface of the lands of such nation or tribe susceptible of allotment among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fair and equal share thereof. Section 21 prescribes how the roll of citizenship of the Five Civilized

Tribes shall be made up by the Commission. One provision of said section reads as follows:

"The rolls so made, when approved by the Secretary of the Interior, shall be final, and the persons whose names are found thereon, with their descendants thereafter born to them, with such persons as may intermarry according to tribal laws, shall alone constitute the several tribes which they represent."

Before allotment of the lands of the Five Civilized Tribes in fair and equal shares thereof could be made, it was necessary to ascertain the number of units that would participate in the division of such lands and tribal property. If the membership of the tribes continued to vary in number because of death, births, and marriages, it would have been impossible to have ever fixed a basis upon which to make a division of the tribal property among its members. It therefore became necessary for additional legislation and treaties with the tribes to fix some date after which children born to the citizens of the tribe should not be enrolled and share in the property, and prior to which date members of the tribe having died should not be enrolled. It was to accomplish this purpose that the act approved June 2, 1900, ratifying the agreement between the Five Civilized Tribes and the Seminole Tribe of Indians, was enacted. Omitting the introductory and concluding parts of the treaty, it consists of only two sections, the first of which reads as follows:

"That the Commission to the Five Civilized Tribes, in making the rolls of Seminole citizens, pursuant to the act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight, shall place on said rolls the names of all children born to Seminole citizens up to and including the thirty-first day of December, eighteen hundred and ninety-nine, and the names of all Seminole citizens then living; and the rolls so made, when approved by the Secretary of the Interior, as provided by said act of Congress, shall constitute the final rolls of Seminole citizens, upon which the allotment of lands and distribution of money and other property belonging to the Seminole Indians shall be made, and to no other persons."

This section fixes a definite ascertainable basis upon which the allotment of the lands and distribution of other tribal property of

Seminole Indians could be made.  Only those Indians living on the 31st day of December, 1899, were to be permitted to participate in the allotment and distribution of the property of the tribe. But, since it was apparent that some of the persons living on ·that date and enrolled as members of the tribe might die before the allotment of the land and distribution of other property of the tribe could be made to them, and since said section prohibits the allotment or distribution of any of the tribal property to other persons than those living on said date and enrolled, it was necessary to provide for the disposition of that portion of the tribal property which would have gone to such a member of the tribe who died subsequent to that date, if he had lived until the time of allotment.    This was the purpose of section 2, *supra*.    Said section does not provide that the lands, money, and other property of any member of the Seminole Tribe of Indians who shall die after the 31st day of December, 1899, shall descend and be distributed as provided in said section, but it provides that "the lands, money and other property to which he would be entitled if living" shall descend as therein provided, and "be allotted and distributed to them accordingly."    This language of the statute can hardly be said to be ambiguous.   By the phrase, "the lands, money and other property to which he would be entitled if living," seems to us was clearly meant all that tribal property which would go to an Indian upon a division and apportionment of the property of the tribe to the members thereof, if such Indian is living at the time allotment takes place; that it includes only tribal property not divided and received by the Indian at the time of his death, and does not relate to property owned and possessed by him at said time.    That such was the legislative intent we think is further indicated by the fact that it is directed that such lands, money, and other property shall be "allotted and distributed" to the heirs specified in the section.   If this statute had intended to include all property of a Seminole Indian and to govern its descent and distribution, these terms would have been surplusage, but they are not used without meaning, and it was intended that, having

provided that such unallotted land should go to the heirs of the deceased as therein provided, the Commission to the Five Civilized Tribes or those authorities having in charge the division of the tribal property and the distribution thereof among the members of the tribe should allot and distribute such property to the heirs just as they would have done to the deceased Indian if he had lived until allotment was made.

We find similar provisions in the treaties and acts of Congress applicable to the other tribes of Indians of the Indian Territory. The language of such acts is not identical with the one here under consideration, nor are they identical with each other, but their purpose and general nature are not different. Section 22 of the agreement with the Choctaw and Chickasaw Tribes of Indians, approved July 1, 1902, in part provides that:

"If any person whose name appears upon the rolls, prepared as herein provided, shall have died subsequent to the ratification of this agreement and before receiving his allotment of land the land to which such person would have been entitled if living shall be allotted in his name, and shall, together with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas." (Treaty with Indians, July 1, 1902, 32 Stat. 641.)

In section 28 of the original agreement with the Creek Tribe of Indians (31 Stat. 870) is found a provision in almost the identical language of the statute under consideration here, except as to the law of descent and distribution made applicable. Said provision reads as follows:

"All citizens who were living on the first day of April, eighteen hundred and ninety-nine, entitled to be enrolled under section twenty-one of the act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight, entitled, 'An act for the protection of the people of the Indian Territory, and for other purposes,' shall be placed upon the rolls to be made by said Commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall

descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

That it was not intended by this provision of said treaty to provide for the descent and distribution of lands allotted to an Indian before his death is made manifest by the provision of section 7 of the same act which provides a law of descent and distribution for lands allotted to a citizen during his lifetime. While the act of which the statute involved in this case forms a part does not provide for a law of descent and distribution as to the lands and property that have been allotted and distributed to a Seminole citizen before his death, we think that the language used in the statute cannot be construed to include such property or to be a general law of descent and distribution applicable to all the property of members of the Seminole Tribe of Indians who have died since December 31, 1899, without interpolating into it words and a meaning that is not suggested by the purpose intended to be accomplished by the statute, nor suggested by the plain words of the section or the context of the act.

By some of the counsel it has been suggested that if section 2, *supra,* of the Seminole Treaty did not control the descent of the allotted lands of Myers Bruner, then the same was regulated and controlled by chapter 49 of Mansfield's Digest of the Statutes of Arkansas (Ind. T. Ann. St. 1899, §§ 1820-1843). Others have suggested that the same was controlled by the tribal laws of descent and distribution of the Seminole Nation. A determination of this question is not necessary to a disposition of this case; for, whichever law was in force and applicable, the result in this case under the record before us would be the same. If the tribal law of descent and distribution of the Seminole Nation applies, it was not pleaded nor proved, and the courts, if any such law exists, do not take judicial notice thereof, and the law of the forum would control. *Hockett et al. v. Alston,* 110 Fed. 910, 49 C. C. A. 180. On the other hand, the provisions of said chapter of Mansfield's Digest were not pleaded or proved, and, if they apply and the

courts take judicial notice of them, the judgment of the trial court is correct in holding that the land descended to the three minor children of the deceased (section 2522, Mansf. Dig. St. Ark. [Ind. T. Ann. St. 1899, § 1820]), and if this court in an action brought in the courts of this state after the admission of the state in which the rights of parties are controlled by the statutes of Arkansas in force in the Indian Territory before the admission of the state does not take judicial notice of such statutes, then the law of the forum would apply, and under it said lands would descend to the three minor children. Section 8985, Comp. Laws Okla., 1909. On May 2, 1890, the President approved an act of Congress, the thirty-first section of which puts in force in the Indian Territory certain general laws of the state of Arkansas as published in 1884 in the volume known as Mansfield's Digest of the Statutes of Arkansas. Among the chapters of said statute placed in force in the Indian Territory by said act was chapter 49, on descent and distribution. Act May 2, 1890, c. 182, 26 Stat. 81. By an act of Congress approved April 28, 1904, entitled, "An act to provide for additional judges in the Indian Territory and for other purposes" (Act April 28, 1904, c. 1824, 33 Stat. 573), it was provided that all the laws of Arkansas theretofore put in force in the Indian Territory were thereby continued and extended in force and operation so as to embrace all persons and estates in said territory, whether Indians, freedmen, or otherwise; but this last act, having been passed subsequent to the death of Myers Bruner, can have no application in this case. Whether prior to the passage of this act the law of descent and distribution of Arkansas put in force in the Indian Territory by the act of May 2, 1890, applied to estates of deceased Seminole Indians, or whether the tribal law of the Seminole Nation applied, has never been decided by any of the appellate courts; and, while a decision of that question in this proceeding would not be *dictum*, it is not necessary to a determination of the correctness of the judgment of the trial court, and, since counsel have merely suggested the question as to which statute is applicable, without

a discussion thereof, and since in all probability there are other cases and numerous estates in that part of the state heretofore embraced in the Seminole Nation which will be affected by a decision of this question, we have preferred not to consider it here, but to postpone a decision thereon until we shall be aided by the discussion of the question by counsel and a decision upon the question is essential to the final determination of the rights of the parties to the controversy.

The judgment of the trial court is affirmed.

All the Justices concur.