## LAMB v. BAKER.

No. 1397.   Opinion Filed January 10, 1911.

1.   **INDIANS—Creek Allotments—Descent and Distribution.** Under section 6 of the Supplemental Agreement with the Creek Tribe of Indians, ratified by act of Congress approved June 30, 1902, (32 U. S. St. at L., p. 500), citizens of the Creek Nation, male or female, and their descendants of Creek blood, although such descendants be not citizens of the Creek Nation, may inherit the allotted lands of a Creek Indian intestate in the manner and order prescribed by chapter 49 of Mansfield's Digest of the Statutes of Arkansas.

2.   **SAME.** Under the law of descent and distribution provided by said section of the treaty, the nieces of Creek blood, being the nearest surviving kindred of a deceased Creek allottee, inherit the allotted lands of said intestate to the exclusion of the intestate's cousin, who is a citizen of the Creek Nation, although said nieces be not enrolled citizens of the Creek Nation or tribe of Indians.

(Syllabus by the Court.)

*Error from District Court, Okmulgee County; W. L. Barnum, Judge.*

Action by Frank E. Lamb against Samuel P. Baker. Judgment for defendant, and plaintiff brings error. Affirmed.

*George S. Ramsey, C. L. Thomas,* and *F. F. Lamb,* for plaintiff in error.

*Mark L. Bozarth* and *Owen & Stone,* for defendant in error.

HAYES, J.  Plaintiff in error brought this action in the court below against defendant in error to recover the possession of a certain tract of land. Plaintiff claims title to the land by virtue of two certain deeds executed and delivered to him by Alberd Tiger and wife on the 21st day of August, 1907, and on the first day of August, 1908, respectively. The land involved is the allotment of Yana Buffalo, a citizen by blood of the Creek Nation, who died intestate in the month of January, 1903. Prior to her death the land had been allotted to her by the Commission to the Five Civilized Tribes, and after her death patent therefor was

duly executed, issued, and recorded. Plaintiff claims that Alberd Tiger, his grantor, is the sole heir at law of defendant Yana Buffalo. Defendant, on the other hand, claims title to the land by virtue of a deed executed and delivered to him on October 15, 1907, by Pauline Bailey, nee McNac, and Polly Brown, nee McNac. He claims that said Pauline Bailey and Polly Brown are the sole heirs at law of Yana Buffalo, and that plaintiff acquired no interest in the land by virtue of the deeds to him from Alberd Tiger; and that defendant now has the legal title and right to possession of the land in controversy. The trial in the court below, which resulted in a judgment in favor of defendant, was upon the pleadings and an agreed statement of facts. The facts pertinent to the questions of law here involved are substantially as follows: Alberd Tiger is the son of one Sumsey, deceased, who was a citizen by blood of the Creek Nation. Sumsey had a sister by name, Lucy. Lucy was the second wife of one Thomas Haynes. Yana Buffalo was the daughter of Lucy and Thomas Haynes. Thomas Haynes, who was a Creek citizen, is now deceased. By his first wife, who was a Seminole Indian, there was born to him a daughter named Mingie who married Charles McNac. Pauline Bailey and Polly Brown, defendant's grantors, are the daughters of Mingie and Charles McNac. Charles McNac was a citizen by blood of the Creek Nation, but his wife Mingic, whose mother was a Seminole Indian, and her two daughters, Pauline Bailey and Polly Brown, were enrolled as citizens of the Seminole Nation.

The question of law which the .foregoing facts present for our consideration is whether the allotment of Yana Buffalo descended to said Alberd Tiger, a citizen of the Creek Nation, a first cousin of said Yana Buffalo, or whether it descended to her nieces and nearest kinsmen, said Pauline Bailey and Polly Brown, who are descendants of a Creek citizen but who are enrolled as citizens of the Seminole Nation and not enrolled as citizens of the Creek Nation or Tribe of Indians.

The order of descent and distribution of lands allotted to Creek Indians at the time of the death of Yana Buffalo is pro-

vided for by section 6 of the act of Congress approved June 30, 1902, entitled: "An Act to ratify and confirm the supplemental Agreement with the Creek Tribe of Indians and for other purposes," hereinafter referred to as the Supplemental Treaty.   32 U. S. St. at L., p. 500.   Said section reads as follows:

"The provisions of the act of Congress approved March 1, 1901 (31 Stat. L., 861), in so far as they provide for descent and distribution according to the laws of the Creek nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory:  *Provided,* That only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation:  *And provided further,* That if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to non-citizen heirs in the order named in said chapter 49."

One of the provisions of the act of March 1, 1901, referred to in the foregoing section, is as follows:

"The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he have no such issue, then he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done, the land shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, free from such limitation."

This last mentioned statute was considered and construed by this court in *De Graffenreid et al. v. Iowa Land & Trust Co.,* 20 Okla. 687, where it was held that under said statute the law of descent and distribution of the Creek Nation controlled the devolution of lands (homesteads and surplus) allotted to a Creek Indian during his lifetime.  It follows from the rule of that case that chapter 49 of Mansfield's Digest of the Statutes of Arkansas was, by section 6 of the Supplemental Treaty, made to apply and control the descent and distribution of allotments of Creek Indians, except as modified or limited by the provisos of that section.  Under the provisions of chapter 49 of Mansfield's Digest, the real estate of an intestate descends and must be distributed in par-

cenary, subject to payment of his debts and the widow's dower, in the following manner: First. To children, or their descendants, in equal parts. Second. If there be no children, then to the father, then to the mother; if no mother, then to the brothers and sisters, or their descendants in equal parts. Third. If there be no children, nor their descendants, father, mother, uncles and aunts and their descendants, in equal parts, and so on in other cases, without end, passing to the nearest lineal ancestor, and their children and their descendants, in equal parts. This general rule of descent is modified to some extent by another section of the chapter, which provides that where the intestate dies without descendants, and his estate came by the father, then it shall ascend to the father and his heirs. If it came by the mother, then it shall ascend to her and her heirs; but if the estate be a new acquisition, it shall ascend to the father for his lifetime and then descend in remainder to the collateral kindred of the intestate in the manner above stated; and in default of a father, then to the mother for her lifetime, then it descends to the collateral heirs as above stated. If section 6 of the Supplemental Treaty had contained no proviso, the allotment of Yana Buffalo would have descended to her kindred in the order of the foregoing provision of said chapter 49, without regard to the presence or absence of Creek blood or citizenship of her kindred. But the order of descent of a Creek allotment to the kindred of a Creek intestate prescribed by said chapter 49 is limited in its application by the first proviso of the section, which provides: *"That only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation."* This proviso confines the kindred who may inherit the allotted land of a deceased Indian to two classes: First, those kinsmen who are citizens of the Creek Nation; and, second, those kinsmen who are Creek descendants of citizens of the Creek Nation. Without the second proviso of the section, the non-citizen kindred without Creek blood could never inherit the allotted lands of a Creek citizen; but the second proviso of the section ingrafts an exception upon the general rule prescribed by the first proviso by providing if there is

no person of Creek citizenship to take descent and distribution of such estate, then the estate shall go to noncitizen heirs in the order named in said chapter 49. These provisos have the effect to make some kindred, when classed under the provisions of chapter 49, inherit to the exclusion of other kindred of the same class. By section 1 of the Supplemental Treaty, it is declared that whenever the words "citizen" or "citizens" appear in the act they shall be deemed to refer to a member or members of the Muskogee Tribe or Nation of Indians, and the words "Creek" and "Muskogee" are declared to be synonymous. The grantors of defendant are descendants of a citizen of the Creek Nation, and their grandfather on the maternal side and their father were members of the Creek Tribe, and their mother was of Creek blood, but was not a member of the Creek Nation; and they, following the citizenship of their mother, were enrolled as members of the Seminole Tribe.

Able counsel for plaintiff contends for a construction of section 6 that makes plaintiff's grantor, Alberd Tiger, although he is the more remote kinsman of the intestate, inherit to the exclusion of defendant's grantors, because, although they were of Creek blood and the nearest surviving kindred, they were not members of the Creek Tribe and enrolled as such. That this is the intent of the statute or treaty, he contends, is conveyed by the second proviso of the section, wherein it makes the right of noncitizens to inherit depend upon the absence of persons of Creek citizenship. Although we cannot say that this contention is without reason to support it, or that we have reached a different conclusion with the feeling that it is correct beyond peradventure, we are unable to concur in it. The meaning of the first proviso of section 6, standing alone and unaffected by the second proviso, is not susceptible of much doubt or debate. Members or citizens of the Creek Nation may inherit and the Creek descendants of such members—that is, their descendants of Creek blood—may inherit in the order provided in chapter 49 of Mansfield's Digest. This proviso has the effect upon the preceding enacting clause of the section that provisos are generally designed to have. It limits the

general language of that clause and denies the right of inheritance to certain kindred that would otherwise be included; and without the last proviso it would have the effect to make the lands of a Creek allottee escheat when there are no kindred of the classes named in the first proviso, although there be left surviving kindred of the classes named in chapter 49 of Mansfield's Digest. It is insisted, however, that the second proviso not only has this effect, but that it has the further effect to limit or define the meaning of the language used in the preceding proviso as to who shall inherit; that it so restricts the language of the first proviso as to make it provide that only citizens (members) of the Creek Nation and their Creek descendants who are citizens (members) of the Creek Nation shall inherit. If the term "citizenship" in the second proviso be restricted and narrowed in its meaning to harmonize with the definition of the term "citizen" made in the first section of the treaty, the result contended for would probably follow; but if the meaning and effect of the second proviso were as thus contended for by plaintiff in error, then the phrase "and their Creek descendants" would be meaningless and without any effect whatever, for the first phrase of the clause, to wit, "only citizens of the Creek Nation," would include "citizens and their Creek descendants who are citizens." Had it been intended that only citizens or members should inherit, the second phrase of this clause would have been omitted. The addition of this phrase permitting the descendants of Creek blood to inherit the individual property of members was a natural thing for Congress and the tribe to do in negotiating this treaty. The Supplemental Treaty is one of several acts of Congress looking to the division of the properties of the tribe and to the dissolution of the tribe and its government and to the complete assumption by members thereof of the position and duties of citizens of the United States. Section 28 of the original Creek Agreement (31 U. S. St. at L., p. 861) provided that no person, except as provided in that agreement, should, after the date of the agreement, be added to the rolls of citizenship of the tribe. The same section provides that all children born to citizens entitled to enrollment up to and in-

cluding the first day of July, 1900, and then living, shall be placed upon the rolls.  Section 7 of the Supplemental Treaty modified this provision to the extent that it provides that all children born to citizens entitled to enrollment subsequent to July 1, 1900, and up to and including May 25, 1901, shall be placed upon the rolls and receive allotments of land.

It is apparent from these provisions of the treaty that Congress and the tribe contemplated that after a date fixed there could be no increase in the membership of the tribe, and that children born to members thereof should not be members of the tribe and should not participate in the division and distribution of the tribal property.  Such provision was necessary, because an equal division of the property among the members could never be ascertained and made until it could be known what number of units would be entitled to participate in the division and distribution.  This number could not be fixed so long as the newly born could be added thereto.  The prohibition against those born in the future, although of full Creek blood, from receiving any part of the tribal property was therefore absolutely necessary in the plan of ending the tribal relations and dividing the tribal property; but no such necessity to deny the future born children of members of the tribe the right to inherit the property of the individual members existed.  On the other hand, there were strong reasons why these childen of Creek blood, who from the force of necessity had been denied the privilege of sharing the tribal property, should be permitted to inherit from their ancestors what they had received from the tribe.  If plaintiff's construction be correct, a child of a Creek citizen, born after May 25, 1901, could not inherit the lands of his parents if the parents left surviving them any kinsman of the remotest degree who was a member of the tribe.  The members of the tribe and Congress must have forseen that a multitude of such cases would arise.  It would have been a harsh treaty that did not provide, in the regulation of the descent of the property of the individual members, for such children to inherit.  The institution of marriage has long been recognized by the Creek Indians, and the obligation of the

family ties observed; and there is among them that same impulse to protect and to provide for their offspring that exists among other civilized races. It is true that it occasionally happens that one in devising his property prefers a stranger or a remote kinsman to his own offspring, but such cases are the rare exceptions to the general rule, and they generally occur when devisor has been estranged from the disinherited child or because of unusual obligation to or attachment between the devisor and the one preferred. It would be a most unusual and unnatural thing for a nation or race to disinherit its offspring, or to prefer by a general rule remote kindred over them, and a construction of any statute leading to such result ought not to be adopted, unless impelled by the plain terms of the statute. That no such result has been uniformly intended by the Creek Indians since the inauguration of legislation and treaties looking to the allotment of tribal lands, is evidenced by that portion of the original Creek Agreement quoted *supra,* which provides that the homestead of each citizen shall remain, after the death of the allottee, for the use and support of the very class of children that, under the construction now contended for by plaintiff in error, the Supplemental Treaty would disinherit. The original treaty made special provision for such children, to the extent of preferring them over children born in time to be enrolled and to participate in the division of the tribal property, by making it a rule of descent that the homestead of a deceased allottee should remain for the benefit of such children. There is nothing in the history of this tribe or of congressional legislation upon this subject that indicates any cause for the tribe and Congress to change their attitude toward this class of descendants and to treat them in the Supplemental Treaty as aliens; whereas, in the original treaty, negotiated within less than two years previous, they had been specially favored in the rule of descent prescribed. If every part of the first proviso of said section 6 be given meaning according to the plain terms of its language, no such result follows. The second proviso was not introduced, in our opinion, to qualify or restrict the meaning of the first one, but to provide

for a line of descent when no heirs of the classes named in the first proviso exist. It is true that if the word "citizenship" in the last proviso be given a meaning as restricted as that given to the word "citizen" by the first section of the treaty, then our conclusion might not follow without difficulty; but a proviso, as other parts of a statute, is to be construed in connection with the whole statute and be construed, if possible, so as to give effect to each and every part of the statute. If the phrase "and their Creek descendants" be given any force, and the next proviso should be held to mean as contended for by plaintiff, then it entirely repeals that portion of the first proviso here quoted. A construction leading to such repugnancy ought to be avoided, if possible. *Savings Bank v. United States,* 19 Wall. 227. This is done if it be held that it was intended by the second proviso to provide that noncitizen heirs may inherit when there are no kindred of the classes mentioned in the first proviso, and that the word "citizenship" was used in the broad sense of including not only members of the Creek tribe but Creek descendants of such members. Such construction does not render this proviso ineffective, for it gives to the first proviso a different effect from what it would otherwise have, in that noncitizen heirs, who are not included in the first proviso, may, under the terms of the second proviso, inherit, if there be no heirs of the classes mentioned in the first proviso. This we think is all that it was intended to accomplish.

It follows that the judgment of the trial court, under these views, should be affirmed.

All the Justices concur.