*WADSWORTH *et al.* v. CRUMP *et al.*

No. 5667.   Opinion Filed March 21, 1916.

Rehearing Denied May 31, 1916.

(157 Pac. 713.)

1.    **INDIANS — Seminoles — Enrollment — Purpose.**   The purpose of preparing the rolls of Seminole citizens required by section 2 of the Seminole Agreement approved by Act Cong. June 2, 1900, c. 610, 31 Stat. 250, was to ascertain the number and identity of Seminoles entitled to share in the allotment of the tribal lands and moneys and other properties belonging to the Seminoles as a tribe.

2.    **SAME—Descent and Distribution—Tribal Agreement.**   Section 2 of said agreement regulates the devolution of lands to which a duly enrolled Seminole citizen would have been entitled if living, where such citizen dies before receiving the same.

3.    **SAME—Statutory Provision.**   In such case the property of the deceased goes to his heirs who are themselves Seminole citizens according to the laws of descent and distribution of the State of Arkansas, subject to the proviso contained in said section.

4.    **SAME—Tribal Agreement—"Citizen."**   The word "citizen," as used in section 2 of said agreement, is not limited to persons whose names are found on the rolls prepared under section 1. Citizenship in the Seminole Tribe did not necessarily extend to or invest in the citizen a personal or individual interest in the common or undivided property of the tribe, but might exist independent of any right to participate in the distribution of tribal property.

5.    **SAME—Enrollment.**   C., a duly enrolled Seminole Indian, died July 4, 1901, before receiving his allotment, leaving him surviving a widow and two daughters who had been enrolled as Creeks. **Held,** that the daughters were heirs of their deceased father under section 2 of the Seminole Agreement approved by Act Cong. June 2, 1900 and inherited the lands to which their father was entitled, to the exclusion of more distant relations, though enrolled as Seminoles.

6.    **SAME—Lands—Dower.**   The surviving widow of a duly enrolled Seminole citizen who died July 4, 1901, before receiving his allot-

*Appealed to the Supreme Court of the United States.

ment, is entitled to dower therein, where said lands are afterwards selected.

(Syllabus by the Court.)

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Action by Annie Wadsworth (formerly Cox) and others against George C. Crump and others. Judgment for defendants, and plaintiffs bring error. Reversed. Former opinion, published in 154 Pac. 60, withdrawn.

*J. S. Severson,* for plaintiffs in error.

*Davis & Patterson,* for defendants in error.

HARDY, J.  Plaintiffs in error, who were plaintiffs in the trial court, brought this action against defendants in error, as defendants, to recover certain lands that had been set apart as the distributive share of the lands of the Seminole Tribe falling to Lewis Cox, a duly enrolled full-blood Seminole citizen, who died intestate on July 4, 1901, before selecting his allotment.  At the time of his death he was lawfully married, and was survived by his wife, Annie, and two daughters, Maggie Beamore and Nancy Alexander, who are the plaintiffs herein.  The only question presented is whether plaintiffs, as the widow and surviving children of Lewis Cox, deceased, are entitled to recover the lands allotted in his name.  Plaintiffs are enrolled as Creek citizens.

On June 2, 1900, Congress approved an agreement with the Seminole Tribe (31 Stat. c. 610, p. 250), sections 1 to 2 of which are as follows:

"First.  That the Commission to the Five Civilized Tribes, in making the rolls of Seminole citizens, pursuant to the act of Congress approved June twenty-eight, eighteen hundred and ninety-eight, shall place on said rolls

the names of all children born to Seminole citizens up to and including the thirty-first day of December, eighteen hundred and ninety-nine, and the names of all Seminole citizens then living; and the rolls so made, when approved by the Secretary of the Interior, as provided by said act of Congress, shall constitute the final rolls of Seminole citizens, upon which the allotment of lands and distribution of money and other property belonging to the Seminole Indians shall be made, and to no other persons.

"Second, If any member of the Seminole Tribe of Indians shall die after the thirty-first day of December, eighteen hundred and ninety-nine, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs who are Seminole citizens, according to the laws of descent and distribution of the State of Arkansas, and be allotted and distributed to them accordingly: Provided, that in all cases where such property would descend to the parents under said laws the same shall first go to the mother instead of the father, and then to the brothers and sisters, and their heirs, instead of the father."

Upon the construction of these provisions depends the correct determination of this case. It should be borne in mind that the result which Congress intended to secure was the allotment in severalty of the tribal lands and the distribution of other tribal property and moneys held by the Seminole Indians as a tribe, and the preparation of the roll provided for by the above legislation was to determine the number of individual Indians entitled to share in the distribution of such tribal property, so that a basis could be found upon which to make such distribution.

Section 1, *supra,* directed the commission to place upon the rolls of Seminole citizens the names of all children born to Seminole citizens up to and including the 31st day of December, 1899, and the names of all Semi-

nole citizens living on that date, and provided that the roll so made, when approved by the Secretary of the Interior, should constitute the final roll of Seminole citizens, upon which the allotment of lands and distribution of money and other property belonging to the Seminole Indians should be made, and excluded from participation in such distribution all other persons. By this provision it was the duty of the commission to enroll plaintiffs Maggie Beamore and Nancy Alexander, as it is admitted that they were the children of Lewis Cox, and were born prior to the 31st day of December, 1899, and, had they been placed upon said roll, would have been entitled to an allotment of tribal lands and a distributive share of other tribal property.

Section 2 provided that, should any member of the Seminole Tribe die after the 31st day of December, 1899, the lands, money, and other property to which he would be entitled if living should descend to his heirs who were Seminole citizens, according to the laws of descent and distribution of the State of Arkansas, with the proviso that in all cases where such property would descend to the parents under the Arkansas law, the same should first go to the mother instead of the father, and then to the brothers and sisters and their heirs instead of the father. This section was held not to apply to that character of lands where the allotment was selected in the lifetime of the allottee, and was held to apply only to cases like the present. *Bruner v. Sanders*, 26 Okla. 673, 110 Pac. 730; *Heliker-Jarvis Seminole Co. v. Lincoln*, 33 Okla. 425, 126 Pac. 723.

It is seen that by section 2 lands of the character here involved were to descend to the heirs who were themselves Seminole "citizens," according to the rule of

descent prescribed by the Arkansas law. To correctly determine what individuals were entitled to take the lands involved we must ascertain the meaning of the word "citizen," as contained in section 2, regulating the descent thereof. It is argued that because the names of the children were not placed on the Seminole rolls, therefore they are not Seminole citizens, and are not entitled to inherit the property of their deceased father, and the decisions of this court, *supra,* are cited in support thereof. The principle here involved was not presented or decided in either of those cases. Is it essential, in order for plaintiffs to come within the meaning of the term "citizens" and to inherit the lands of their father, that their names appear on the rolls? We think not. The purpose of making the rolls was to ascertain the number and identity of those entitled to participate in their own right in the distribution of tribal property, and, this being the purpose of making said rolls, as expressed in section 1 of the act, *supra,* we should not extend the meaning thereof, unless it is clear it was the intention of the parties to the agreement that such meaning should be given to the language used. This could not be the intention, in view of the fact that section 1 directed the names of all children born to Seminole citizens up to and including December 31, 1899, to be placed on the rolls, and here is a recognition of the fact that children situated as were these plaintiffs were not aliens, and were not to be excluded from the inheritance of their fathers, but were to be recognized and provided for, notwithstanding previous tribal customs, which it is said the commission had followed in enrolling plaintiffs as Creeks. The tribal existence was nearing its dissolution, the common property was about to be distributed, and provision was to be made

governing the devolution of Seminole property to which citizens were entitled where such citizens should die before receiving their share; provision having already been made for other classes of property. The Seminoles were one of the Five Civilized Tribes, and had adopted many of the social habits and industrial customs and pursuits of the white race. The institution of marriage was recognized among them and the binding obligation of family ties was observed, and they were subject to the same influences that prompted other civilized races to protect and provide for their spouses, and offspring, and it would require the most powerful and impelling reasons for us to hold, in view of these facts, which are well known, that it was the intention of these Indians to deliberately exclude from participation in the distribution of the property of an individual Indian his own flesh and blood and those who bore to him the closest relations that can exist in civilized communities.

The word "citizen," as used in the legislation of Congress respecting the Indians of the Five Civilized Tribes (and this agreement is but legislation of that character), does not necessarily include the right to share in the distribution of tribal property. The Court of Claims, in *Whitmire, Trustee, v. Cherokee Nation*, 30 Ct. Cl. 152, said:

"The idea therefor existed, both in the mind and in the laws of the Cherokee people, that citizenship did not necessarily extend to or invest in the citizen a personal or individual interest in what the Constitution termed the 'common property,' 'the lands of the Cherokee Nation.'"

And again in the same case, in discussing the status of certain classes of persons that had been admitted to citizenship in the tribe, it was said:

"It was no more thought that these strangers would be admitted to share in the unoccupied lands of the Cherokees than in their cultivated fields. To allow them to dwell within their territory and vote and be called Cherokee citizens and enjoy political rights was one thing; to give them an equal share with themselves in their own exclusive, though undivided, property was another."

In *Stephens v. Cherokee Nation*, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041, the Supreme Court of the United States, in discussing legislation of Congress in reference to winding up tribal affairs of the Five Civilized Tribes, said:

"It may be remarked that the legislation seems to recognize, especially the act of June 28, 1898, a distinction between admission to citizenship merely and the distribution of property to be subsequently made, as if there might be circumstances under which the right to share in the latter would not necessarily follow from the concession of the former."

And the same thought was in the mind of the court in the case of *Redbird v. U. S.*, 203 U. S. 76, 27 Sup. Ct. 29, 51 L. Ed. 96, where the Supreme Court, after calling attention to the distinction between different classes of citizens in the Cherokee Nation, which was discussed by the court in that case, said:

"And the same distinction between citizens as such and citizens with property rights has also been recognized by Congress in enactments relating to other Indians than the Five Civilized Tribes. Act August 9, 1888, 25 Stat. L. 392, c. 818; Act May 2, 1890, 26 Stat. L. 96, c. 182; Act June 7, 1897, 30 Stat. L. 90, c. 3."

Thus the right to share in the distribution of tribal property is not essential to citizenship, nor does the fact that one has been omitted from the tribal rolls, though he is thereby deprived of his right to share in the distribution of such tribal property, also exclude him from all the other rights and privileges of citizenship. *Lamb v. Baker,* 27 Okla. 739, 117 Pac. 189, involved a construction of section 6 of the act of Congress approved June 30, 1902 (32 Stat. 501, c. 1323), and known as the Supplemental Creek Agreement, whereby it was provided that only citizens of the Creek Nation, male and female, and their Creek descendants, should inherit lands of the Creek Nation, and, in the event there were no persons of Creek citizenship to take by descent, the inheritance might then go to noncitizens; and, construing that provision, it was held that, where a Creek citizen died leaving surviving him certain heirs who had been enrolled as Seminole citizens, yet who were possessed of Creek blood, they were entitled to take the inheritance in preference to relatives more distantly related, though enrolled as Creek citizens. This principle was adhered to in the case of *Hughes Land Co. et al. v. Bailey et al.,* 30 Okla. 194, 120 Pac. 290.

It is urged that the commission in enrolling plaintiffs followed the tribal custom whereby the children of a Seminole marriage followed the blood of their mother, and therefore took the citizenship of the mother, under which custom, if the mother were not a Seminole, the children were excluded from citizenship in the Seminole tribe. If the word "citizen" be given the meaning which counsel contend should be given, it would have the effect of making the rolls conclusive evidence of citizenship in the Seminole Nation for all purposes, and, where a Seminole citizen duly enrolled and entitled to an allotment died

before receiving it, same could only be inherited by those whose names were on the tribal rolls, and this would operate to exclude children born after December 31, 1899, even though both parents be full-blood Seminole Indians, because section 1 excludes from enrollment all children born after that date. Likewise, if children born before that date to full-blood Seminoles for some cause were omitted from the rolls, they would be denied inheritance from their parents, and the allotments of the parents would go to the collateral kindred where the parents died before receiving the same; so also the wife of any Seminole citizen, whether married before or after December 31, 1899, would have no interest in the allotment of her husband, and would be incapable of inheriting from her children should such children die after enrollment and before receiving their allotment, unless her name appeared on the Seminole rolls. We cannot believe this result was intended when a different rule applies in cases where the allotment was selected during the lifetime of the allottee. Neither does the fact that plaintiffs are enrolled as Creeks add any force to defendants' contention. It is a matter of history that the Seminole Tribe are closely related to the Creek Indians, and marriage between the members of the two tribes has been common, and by section 36 of the Original Creek Treaty (31 Stat. 861) it was provided that Seminoles who settled in the Creek Nation might take allotments therein, and that Creeks who settled in the Seminole Nation should be permitted to take allotments in that nation, when such provision had been ratified by both tribes. Whether it was, in fact, ratified we are not at this time informed, but this circumstance tends to show the relations existing between the two peoples, and excludes the idea that

any special reason existed why plaintiffs and those similarly situated should be excluded from participating in the tribal affairs other than the original allotment, merely because they had been enrolled as Creeks.

The plaintiff Annie, the surviving widow of deceased, not being a citizen within the meaning of the legislation here under consideration, did not take any interest in the allotment of deceased as an heir, and the contention of defendants in error would be correct unless she be entitled to dower therein.

By the act of May 2, 1890, chapter 53, Mansf. Dig. of the Laws of Arkansas, entitled "Dower," together with other general laws of that state, was extended over and put in force in the Indian Territory (*Melton v. Lane,* 29 Okla. 383, 118 Pac. 141, Ann. Cas. 1913A, 628; *Burdette v. Burdette,* 26 Okla. 416, 109 Pac. 922, 35 L. R. A. [N. S.] 618; *Curry v. McDaniel,* 33 Okla. 19, 124 Pac. 319) ; and it has been held under this legislation that a widow was entitled to dower in the allotment of her deceased husband who was an Indian and who had selected an allotment in his lifetime (*Hawkins v. Stevens,* 21 Okla. 849, 97 Pac. 567).

The question as to whether a widow was entitled to dower in the allotment of her deceased husband, who was a duly enrolled Indian citizen, and who died before receiving his allotment, was considered in *Cook v. Childs,* 49 Okla. 321, 152 Pac. 88. This case involved a construction of section 22 of the Supplemental Treaty with the Choctaw and Chickasaws (Act July 1, 1902, c. 1362, 32 Stat. L. 641), which provides that, if any person whose name appeared upon the rolls of those tribes should die subsequent to the ratification of that agree-

ment and before receiving his allotment. of lands, said lands should be allotted in his name, and, together with his share of other tribal property, descend to his heirs according to the laws of descent and distribution as contained in chapter 49 of Mansfield's Digest of the Laws of Arkansas, and it was held the surviving widow was entitled to dower in the allotment of her deceased husband where same had been selected as therein provided.

The provisions of· section 22 of the Choctaw-Chickasaw Supplemental Agreement are similar in language to section 2 of the Seminole Agreement, here involved, and upon authority of that case we hold that the plaintiff Annie, as surviving widow of the deceased, Lewis Cox, is entitled to dower in the lands involved.

The former opinion herein by the commission is withdrawn, and the judgment of the trial court is reversed, and this cause remanded, with instructions to render judgment in favor of plaintiffs in error in accordance with this opinion.

All the Justices concur.