## CARTER OIL CO. v. SCOTT et al.

(District Court, N. D. Oklahoma. May 21, 1926.)

No. 10.

**1. Indians ⬯13—Descriptive matter in rolls of Five Civilized Indian Tribes, prepared under statutory authority, held entitled to great weight, and cannot be discredited or ignored, in absence of strong and convincing evidence to contrary.**

Descriptive matter, such as age, sex, and parentage, contained in census cards of Five Civilized Indian Tribes, prepared by Dawes Commission under statute requiring it to make enrollment record of citizenship, descriptive of citizens enrolled, is entitled to great weight, and cannot and will not be discredited or ignored in absence of strong and convincing evidence to contrary.

**2. Indians ⬯18—Land allotted to Creek Indian, having Creek father and Seminole mother, came to her by father, and was inheritable by father and his heirs, to exclusion of mother's heirs (Mansf. Dig. Ark. § 2531; Act May 2, 1890, §§ 30, 31, 26 Stat. 81).**

Land allotted to Creek Indian, having Creek father and Seminole mother, came to her through father, within Mansf. Dig. Ark. § 2531, put in force in Indian Territory by Act May 2, 1890, §§ 30, 31, and on death of allottee ascends to her father and his heirs, to exclusion of mother's heirs.

**3. Indians ⬯18—Citizens of Creek Nation and their descendants of Creek blood may inherit lands allotted to Creek Indian and allottee's niece of Creek blood was entitled to allottee's land, to exclusion of grandchildren and great-grandchildren of allottee's aunt, who were citizens of Creek Nation, though niece was member of Seminole tribe; "Creek descendants" (Supplemental Agreement with Creek Tribe of Indians, § 6 [Act June 30, 1902, 32 Stat. 500]; Mansf. Dig. Ark. §§ 2522–2545; 2 Words and Phrases, Second Series, p. 9).**

Under Supplemental Agreement with Creek Tribe of Indians, § 6, ratified by Act June 30, 1902, 32 Stat. p. 500, citizens of Creek Nation and their descendants of Creek blood, though such descendants are not citizens of Creek Nation, may inherit allotted lands of Creek Indian, as prescribed by Mansf. Dig. Ark. §§ 2522–2545, and niece of Creek blood, who was nearest surviving kin of allottee, inherited lands to exclusion of grandchildren and great-grandchildren of allottee's aunt, who were citizens of Creek Nation, notwithstanding such niece was enrolled in Seminole Tribe; "Creek descendants," within said section 6, meaning descendants of Creek blood, and not requiring Creek citizenship (citing Words and Phrases, Second Series); "descendant."

**4. Statutes ⬯188.**

Words and phrases employed in a statute will be given their plain, ordinary meaning according to import of language used.

**5. Courts ⬯96(1).**

Decision of Supreme Court relating to devolution of Seminole Indian lands is not controlling in case involving devolution of Creek Indian lands under a different statute.

In Equity. Suit by the Carter Oil Company against Louis Scott and others. Decree for plaintiff.

James A. Veasey, L. G. Owen, C. M. Oakes, and Walter Davison, all of Tulsa, Okl., for plaintiff.

G. R. Horner, of Okmulgee, Okl., for Scott heirs.

Lafayette Walker, of Okmulgee, Okl., for Tiger heirs.

W. E. Disney and John M. Wheeler, both of Muskogee, Okl., and R. W. Stoutz, of Tulsa, Okl., for Elizabeth Gambrill, May Davis, and Beulah Mingo.

J. S. Severson, of Tulsa, Okl., for Anderson heirs.

George L. Burke, of Sapulpa, Okl., for Frank W. Mason.

Stone, Moon & Stewart, of Muskogee, Okl., for Ira E. Cornelius.

W. D. Humphrey, of Tulsa, Okl., for Mason heirs.

KENNAMER, District Judge. This is an action to quiet the title to certain land which had been allotted to Louisa Fulsom, a Creek Indian, enrolled opposite roll No. 3917, by the Muskogee or Creek Nation. It is undisputed that Louisa Fulsom was the daughter of Co-wok-o-chee and Hoktee, who were members of Artusse town, a Creek town; that she was the wife of Thomas Fulsom; and that she had no children. Louisa, the allottee, was survived by a sister, Jemima Fulsom, who died a short time after the death of the allottee, leaving a daughter, Lena Edwards. Co-wok-o-chee, the father of the allottee, was a member of the Creek Tribe of Indians, while Hoktee, the mother, was a Seminole Indian. The Seminoles were a wandering tribe, having separated at a very early date from the Creek Tribe, of which they were originally a part, and in later years intermarriage between the two tribes became not uncommon. It was not unusual, in a case of intermarriage between members of two different Indian tribes, that the children of such marriage be enrolled as members of different tribes, and such a situation arose in Co-wok-o-chee and Hoktee's family. The allottee, Louisa, was enrolled as a member of the Creek Tribe, her father being a Creek, while her sister, Jemima, was enrolled as a member of the tribe to which her mother belonged, the Seminole Tribe. Lena, the daughter of Jemima and the niece of Louisa, the allottee, was a Seminole, being enrolled

as a member of her mother's tribe. Plaintiff's grantors secured deeds of conveyance from Lena, and this constitutes the basis of plaintiff's claim.

Certain defendants, which, for the purpose of convenience, will be designated the Scott claimants, assert a claim to the title of the lands involved, by reason of their relation to the sister of Co-wok-o-chee. It is their claim that Cheninee was a sister of the allottee's father, that she was a member of the Creek Tribe of Indians, and that, although they are more distantly related to Co-wok-o-chee than Lena, they being grandchildren and great-grandchildren of Cheninee, they are entitled to inherit to the exclusion of Lena, because they are members of the Creek Tribe of Indians. This contention will involve a consideration of certain acts and treaties, as well as decided cases, which will be discussed at some length. Other claimants, to be designated the Tiger heirs, base their claim to the lands involved by reason of being descendants of one Leester, or Lizzie Tiger, a sister of Hoktee, the mother of the allottee.

The Anderson heirs, so termed for convenience, from whom Cornelius claims, base their right to the lands in question upon the assertion that the allottee, Louisa, had a sister by name of Betsy, who died subsequent to the death of the allottee, and who was enrolled as a member of the Creek Tribe. The evidence adduced upon the trial of the case establishes conclusively that Co-wok-o-chee and Hoktee of Artusse town, the father and mother of Louisa, the allottee, never had a child by name of Betsy. That there were other Indians by name of Co-wok-o-chee was clearly established, and there was evidence tending to prove that the father of Betsy was an Indian by this name. However, the evidence disclosed that the father of Betsy was a different Co-wok-o-chee than the father of Louisa, and that these claimants failed to prove that they were descendants of the Co-wok-o-chee, the father of Louisa, the allottee.

The interveners, Elizabeth Gambrell and Beulah Mingo, claim title as descendants of an alleged sister and brother of the allottee, Louisa Fulsom, whose names are Betsy Fife and Stephen Fife, respectively. Evidence was offered tending to show that the father of one Betsy Fife and Stephen Fife was an Indian by name of Co-wok-o-chee, who was a member of the Creek Tribe. However, it was established beyond all question of doubt that the Co-wok-o-chee, the father of Betsy and Stephen Fife, was not the Co-wok-o-chee of Artusse town, and the one who was the father of Louisa and Jemima. These interveners failed to prove that they were descendants of the Co-wok-o-chee, who was the father of the allottee. Others filed pleadings in this cause, setting up claims to the land in question, but did not appear at the trial of the case.

[1] In addition to numerous witnesses, there was introduced into the case a number of exhibits, consisting principally of records of the Indian Agency, the records of which were established by the Dawes Commission, whose duty it was to make rolls of the citizens of the Five Civilized Indian Tribes. The Commission, by virtue of various acts of Congress, was compelled, in making the rolls of citizens, to make such rolls descriptive of the citizens enrolled, so that any particular citizen could be identified from the rolls so made. It was the duty of the Commission to distribute the lands among the various Indians, and it cannot be doubted that it was indispensable to the proper distribution of the property, there being a number of citizens having the same names upon the rolls, that the rolls be so descriptive of a citizen as to make it possible to distinguish one citizen from another. The Commission employed the use of a census card for each citizen, entered on the rolls of citizenship. This card contains a description of the citizen enrolled upon the final approved rolls of the Five Civilized Tribes. The information set forth on the cards, such as the age, sex, and parentage of the citizen, is descriptive matter, and, considering the fact that these descriptive words were placed upon these records pursuant to a statutory duty, as a matter of evidence, they are entitled to great weight, and cannot and will not be discredited or ignored, in the absence of strong and convincing evidence to the contrary. Page v. Atkins, 86 Okl. 290, 208 P. 807, 818. Certified copies of Creek and Seminole census cards clearly establish the facts above set forth.

[2] By Act of Congress of May 2, 1890, c. 182, 26 Stat. 81, §§ 30 and 31, chapter 49 of Mansfield's Digest of the Statutes of Arkansas were put in force in the Indian Territory, to govern the descent and distribution of lands allotted to Indians. Section 2531 of said Digest provides as follows:

"In cases where the intestate shall die without descendants, if the estate come by the father, then it shall ascend to the father and his heirs; if by the mother, the estate, or so much thereof as came by the mother,

shall ascend to the mother and her heirs. * * * "

The land and estate involved in this action came to Louisa as a member of the Creek Tribe of Indians, her father's tribe. It is clear that the estate came to her by her father, Co-wok-o-chee, since her mother was a Seminole. The whole estate must be said to have "come by the father," so that the estate, by reason of the above section of Mansfield's Digest governing the descent and distribution of lands at the time of the death of the allottee, ascends to the father, Co-wok-o-chee, and his heirs. Under this "ancestral estate doctrine," none of the inheritance will go to the heirs of the allottee's mother, since she is a Seminole, for the reason that no part of the estate can be held to have come by the mother. The Tiger heirs claim the estate as descendants of a sister of the allottee's mother; but, under the doctrine above announced, I am of the opinion that they are not entitled to the estate.

[3] Thus the controversy is narrowed down to the plaintiff's claim and the claim of the Scott heirs. It is urged by counsel for these defendant claimants that the title under which the plaintiff claims cannot be sustained, for the reason that Lena Edwards and her mother, Jemima, were enrolled Seminole Indians, that the allottee and her father were members of the Creek Tribe of Indians, and therefore, under section 6 of the Supplemental Agreement with the Creek Tribe of Indians, ratified by an Act of Congress approved June 30, 1902 (32 Stat. p. 500), Lena and her mother, Jemima, were excluded. These defendants claim as descendants of a sister of Co-wok-o-chee, the father of the allottee, and insist that they are entitled to succeed to the estate in question, because they claim through descendants who are members of the Creek Tribe of Indians, although more distantly related to the allottee than Lena. I am unable to agree with this contention.

The order of descent and distribution of lands allotted to Creek Indians at the time of the death of Louisa, the allottee, is provided for by section 6 of the act of Congress referred to above. The section contains the following language:

"The provisions of the act of Congress approved March 1, 1901 (31 Stat. 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory: Provided, That only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation: And provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49."

It is contended by counsel for the defendant claimants that the above section should be so construed as to entitle them to inherit the estate, although they are more remote relatives than Lena, for the reason that Lena is not a member of the Creek Tribe of Indians. Briefly, it is contended that the right of noncitizens to inherit is dependent upon the absence of persons of Creek citizenship. This very question has been considered no less than three times by the Supreme Court of the state of Oklahoma.

In Lamb v. Baker, 27 Okl. 739, 117 P. 189, the Oklahoma Supreme Court held that, under section 6 of the above act of Congress, citizens of the Creek Nation, male or female, and their descendants of Creek blood, although such descendants be not citizens of the Creek Nation, may inherit the allotted lands of a Creek Indian intestate in the manner and order prescribed by chapter 49 of Mansfield's Digest of the Statutes of Arkansas. In that case a niece of the intestate Creek Indian was held to have inherited the estate, although a Seminole Indian, to the exclusion of a Creek cousin of the intestate. This case was followed by the Supreme Court of Oklahoma in the case of Hughes Land Co. v. Bailey, 30 Okl. 194, 120 P. 290. The opinion in Lamb v. Baker, supra, was filed January 10, 1911, and constituted the recognized and established law governing this situation in Oklahoma until January 30, 1923, when it was overruled by the Supreme Court in the case of Grease v. McNac, 102 Okl. 44, 225 P. 524. It should be noted that the case of Grease v. McNac was decided by a divided court. It should be observed that in the rapidly developing state of Oklahoma many titles were acquired upon the assumption that the law announced in Lamb v. Baker, supra, was the settled law of Oklahoma. Plaintiff acquired its title during this period of time and prior to the overruling of the above doctrine.

The reasoning employed in Lamb v. Bakker conforms with my thoughts and ideas as to the proper construction to be placed up-

on the act under consideration. From a consideration of its provisions, there may be seen two classes who may inherit the allotted lands of a Creek Indian: First, those who are citizens of the Creek. Nation; and, secondly, those who are Creek descendants of citizens of the Creek Nation. The precise question to be decided is what is meant by "Creek descendants"? The last utterance of the Oklahoma Supreme ·Court in the McNac Case held that more than being descendants of Creek blood was necessary, upon the theory that the word "Creek," preceding the word "descendants," would be superfluous, if only Creek blood was required. I am unable to concur in this view as to the proper construction of the act in question. If the latter class provided for is to require more than Creek blood—to require Creek citizenship, as construed by the Grease v. McNac decision, supra—then that portion of the act, the words "and their Creek descendants," is superfluous, and will have no meaning, because the very act itself; provides for descent and distribution according to chapter 49 of Mansfield Digest, but limits such succession to citizens of the Creek Nation and their Creek descendants. If this second class is to be limited to enrolled Creek citizens, it has no meaning or purpose, since the words preceding expressly provide for that particular class. It seems that the proper construction should be that two classes are provided for, to wit, Creek citizens and their Creek descendants.

We should next determine what is meant by "Creek descendants." The word "descendant" has been defined by courts as an individual proceeding from an ancestor in any degree; issue; issue of any degree; any person proceeding from an ancestor in any degree; offspring or posterity in general. 18 C. J. 792, and authorities cited. See 2 Words and Phrases, Second Series, p. 9; In re Cook, 50 Misc. Rep. 487, 100 N. Y. S. 628, 629. If the ancestor from whom the individual sprung was a Creek Indian, it is obvious that the individual is a Creek descendant, even if such individual be enrolled as a Seminole Indian. It seems obvious to me that an enrolled Seminole may be as much a Creek descendant as a Creek, as, for example, the family under consideration. The father, Co-wok-o-chee, was a Creek; his wife, a Seminole; one daughter, Louisa, enrolled as a Creek, while the other daughter, Jemima, was a Seminole. Can it be contended that Louisa is any more a Creek descendant than her sister, Jemima, who happened to be enrolled as a Seminole? I think not.

[4] The conclusion reached in Grease v. McNac, supra, is based upon the theory that the word "Creek," as used in the proviso of section 6, relates more to a political status than to blood. It should be borne in mind that the political status of the members of tribes was fixed by the approved rolls made by the Dawes Commission; that is, his right to an allotment and to participate in the common tribal property, as well as his status as a citizen, was fixed and determined by enrollment. I am of the opinion that the Creek Nation, in adopting the laws of descent and distribution heretofore described, intended that there should be two classes of persons eligible for inheritance of Creek lands and property. As heretofore suggested, provision was made for Creek citizens and their Creek descendants. It is a rule of construction well settled by the authorities that words or phrases employed in a statute will be given their plain, ordinary meaning according to the import of the language used.

[5] Counsel for the defendant claimants insist that the case of Campbell v. Wadsworth, 248 U. S. 169, 39 S. Ct. 63, 63 L. Ed. 192, by reason of its reference to the case of Washington v. Miller, 235 U. S. 422, 35 S. Ct. 119, 59 L. Ed. 295, destroys the efficacy of the doctrine announced in Lamb v. Baker, supra. I cannot concur in this. The case of Campbell v. Wadsworth had under consideration a different act of Congress than the Creek Supplemental Agreement, which is involved in this case. In the Wadsworth Case, supra, a father, enrolled only as a Seminole, the roll referring to his wife and family as Creeks, died after that date, leaving a wife and daughters, who were enrolled as Creeks, their roll describing him as an enrolled Seminole. It was held that the father's share of Seminole lands, subsequently allotted, did not descend to the mother or the daughters. The act considered by the Supreme Court of the United States is as follows:

"Second. If any member of the Seminole tribe of Indians shall die after the thirty-first day of December, 1899, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs who are Seminole citizens, according to the laws of descent and distribution of the state of Arkansas, and be allotted and distributed to them accordingly. * * *" Act Cong. June 2, 1900, c. 610, 31 Stat. 250.

The distinction between the above act of Congress and the Creek Supplemental Agreement is quite patent. It should be not-

ed that in the Seminole Agreement, supra, it is expressly provided that the lands, money, and other property shall descend to heirs *who are Seminole citizens.* Thus the devolution of the estate of a deceased Seminole allottee is limited to heirs who are Seminole citizens, as found upon the approved rolls. It is of importance to observe that the Creek Agreement, supra, provides as much for Creek descendants as it does for Creek citizens, as those who may inherit Creek lands. The Seminole Treaty plainly limits the devolution of estates to Seminole citizens, while the Creek Treaty provides for the two classes,— Creek citizens and Creek descendants. Since the act of Congress involved in this action was not considered by the court in Campbell v. Wadsworth, supra, it cannot be considered as controlling in this case.

The case of Washington v. Miller, 235 U. S. 422, 35 S. Ct. 119, 59 L. Ed. 295, cited in Campbell v. Wadsworth, supra, did not deal with the situation involved in the case at bar. The holding of the case was that land of one Waitie Washington, whose father was a Seminole, and whose mother a Creek, did not pass to the Seminole father, but to the Creek mother, Waitie being an enrolled Creek. Two questions were decided by the Supreme Court in the case, but the question as to whether a Seminole father would inherit under the proviso as a Creek descendant was not passed upon by the court. The case merely decides that an enrolled Seminole cannot inherit as a citizen of the Creek Nation, which is undoubtedly a sound holding.

Plaintiff contends that the parties to this action are bound by a proceeding had determining and fixing the heirs of the allottee, which proceeding was had in the proper county court of this state. It being unnecessary to pass upon the regularity or validity of these proceedings in determining the questions presented in this case, the same will not be considered. I am of the opinion that the doctrine announced by the Oklahoma Supreme Court in the case of Lamb v. Baker, supra, is the correct construction to be placed upon the act in question, and that Creek estates may descend to noncitizens so long as they are Creek descendants, as by the act provided.

In view of this holding, it is necessary to make a finding that the intervener, claiming an interest in the estate by virtue of a conveyance from one Josey Bell, has failed to sustain the burden of proving the necessary relationship with the allottee. It was contended that Josey Bell was a nephew of the allottee, and was a Seminole. The evidence fails to establish this relationship.

It is the order of the court that decree be entered quieting title to the lands in question in the plaintiff, the Carter Oil Company.